May it please the Court, Your Honors, my name is Christopher Kurowski. I apologize for my lateness. I grossly underestimated the amount of our fellow Giants fans who would be traveling to the city. Well, we're happy that we can accommodate you, but you should probably apologize more to your co-counselor, because she ended up at the end of the calendar, and she would have been, she could have left at ten o'clock. I do apologize. I live in West Sonoma County. It usually takes me two hours to get here. Today it was three and a half. Well, you've had, all my life I've had dreams about not being able to make it to court, so you've now, you're proof of, you know, I'll probably start having them again. I had my nightmare. Go ahead. So, Your Honor, I'd also like to introduce or point out that Mr. Gorceac himself is here on my left. I'm sorry. Gorceac, I'm sorry. I've mispronounced it the whole time. I'd like to reserve two minutes, if I might. Very briefly, Mr. Gorceac's a little bit of an unusual asylum applicant. He is a member, was a member of the Moldovan Foreign Service and a diplomat. He served a number of years under the democratic government of Moldova after it broke off from the Soviet Union, and he served in various foreign embassies and consulates, and then in 2001, when the Moldovan government was taken over by the Communist Party, he was summoned back to Moldova, removed from his position, put under surveillance by the government, and harassed, attacked, and arrested. He, when he came back, engaged in political activities on behalf of a democratic group there, gave a public speech denouncing the government repression, and as a result, was arrested, interrogated by the Moldovan successor to the KGB. He was held in a cell without unidentified persons coming back from church, one of whom he recognized as a policeman. Well, because our time is limited, and he was, the area that I would like you initially to focus on from my perspective is, why didn't, you know, assuming, why didn't the government rebut with changed country conditions? Because in my reading of the record, the BIA examined multiple documents, including a State Department advisory opinion that provided information on two similarly situated individuals who were also former employees of the foreign ministry, a news article from 2002 that showed Mr. Gorszak, former boss, was now a professor and a dean of the Moldova State University, and three, a 2004 State Department country report on current conditions in Moldova. So there has to be, it has to be rebutted, but it also has to be individualized, and, you know, we do a lot of these cases, you can't avoid them on the Ninth Circuit, and it seems to me that this was more individualized than I see frequently, in that he actually, you know, had one of the people that he was I think, thank you for asking that question, Your Honor. It depends a lot on how you define individualized. I mean, it was a State Department report, it was a two-page letter which addressed Mr. Gorszak's situation. However, there was, we would argue, a very incomplete reading of that State Department report, the country conditions report, and second of all, there was also a complete failure to consider 13 exhibits that Mr. Gorszak submitted which showed extreme violations of human rights and political freedom in modern-day Moldova that were not mentioned at all by the board, were not mentioned at all by the immigration judge, and we feel that that's the second reason why this was not a proper individualized review of whether or not things had changed in Moldova. And if you specifically look at pages 24, 27 of our brief, first of all, there's an incomplete reading of the Department of State report, and we point out numerous things that were missing or ignored by the board in reading the country conditions report of the State Department itself on the conditions in Moldova. Well, now, okay, just for our standard of review, we're looking at substantial evidence is what we're looking at, right? And it's a deferential standard. So the fact that there is conflicting evidence in the record, you know, if the board resolves some things adversely to you, we have to look in terms of is there substantial evidence, correct? That is correct, Your Honor. However, if you look at the cases that I cited in my brief, Mohammed v. Gonzalez, for one, this court found that the board, where it gave no indication that it had considered certain evidence on the issue of rebutting the risk of persecution. Counsel, I have a related question to Judge Callahan's, so I'd appreciate it if you would address it. And that's this. When the State Department sent their letter, which provided comparative information about the state of what was happening with some other diplomats who I think said they could work in Moldova safely, or the ambassador took a different job at a university, is there any evidence at all in the record that either those other diplomats or the ambassador are similarly situated to the State Department? To Mr. Gorsiak, in the sense that they engaged in public political demonstrations against the government? Because I didn't see that in the letter, and I wasn't aware. True, if there is no evidence that they engaged in political demonstrations, what would, first is that true? And if that's true, what's the significance of that? It's very significant, Your Honor, and you're absolutely right. There was no evidence that the people who were cited by the State Department in that letter and cited by the board and cited by the immigration judge, specifically the ambassador who returned to Moldova, and I think one or two other foreign ministry officials, there was no evidence that they were political opponents of the government. There was no evidence that they engaged in activities such as Mr. Gorsiak did, and there's no evidence that they gave, for example, speeches against the communist government. And I would respectfully suggest that if you look at what happened to Mr. Gorsiak, why was he arrested, why was he beaten, why was he held without charges? It was because, not because he was a former foreign ministry official, it was because precisely he had engaged in those kind of political activities, speaking out against the government, being involved with democratic activities. The ambassador that is cited over and over again by the board was not involved in any of those things when he returned to Moldova. Neither were the others. And that's why we feel that's an improper comparison, as Your Honor alludes to. It's not fair to compare Mr. Gorsiak to former government officials, ministry officials. It's better to compare him and more apt to compare him to political opponents of the government. And that's where the State Department went wrong, and that's where the board went wrong in interpreting the State Department. What should have happened here is they should have looked at the other political opponents and how they were being treated in 2005. And we believe that both the State Department report, if it's looked at even-handedly and all of those materials as we've cited in our briefs, do show that political opponents were not treated fairly, were persecuted or at least at risk of persecution when they returned to Moldova or when they lived in Moldova, even as of 2005 when the board made its decision. So we feel that the advisory opinion and the BIA both focus inappropriately on foreign ministry officials rather than political opponents, which is what Mr. Gorsiak was. And please remember that under this Court's ruling in Lim and the United States Supreme Court precedent, we only need to show a 10 percent risk of harm, of a well-founded fear of harm, 10 percent risk of harm to Mr. Gorsiak if he's returned. And based on his background, both as a political opponent and as a foreign ministry official, prominent political opponent, we feel there wasn't substantial evidence, to answer Your Honor, there was not substantial evidence to reach the finding by the board that there was less than 10 percent risk to Mr. Gorsiak if he's returned. That's what this Court needs to find. They need to basically agree with the board that there was less than 10 percent risk of harm to Mr. Gorsiak. Do you want to save your minute for rebuttal? Because you only have one minute left. Okay. Thank you, Your Honor. Good morning. Good morning, Your Honors, and may it please the Court. My name is Catherine Clark, appearing on behalf of the Attorney General. The analysis in this case was sufficiently individualized, as Judge Callahan has noted. Additionally, with respect to Judge Gould's concerns, the ambassador was a political opponent in this case. And not only that, he made What does the record show on that issue? On that issue, the record shows, and Petitioner indeed testified, that the ambassador made his opposition to the Communist government and his refusal to serve the Communist government known, and also that that opposition was published in a similar way to, in the news. In fact, was more widely publicized than Petitioner's speech at one rally, when he was in fact a lower profile figure than the ambassador was. And the ambassador was a political figure. Additionally, one of the other individuals cited in the advisory opinion was a high-level official at a Moldovan NGO that advocated civic participation in foreign policy issues. And that, of course, certainly, well, those aren't exactly the same thing as Excuse me. As to that person mentioned in the State Department letter, is there evidence that that person publicly protested the Communist government? With respect to the individuals in the advisory opinion, there is no evidence as to public protest, but again, they were not the only people that the agency relied on to find that the presumption had been shattered. Let's just focus on them for a minute. If there's no evidence that those people in the letter made political protests, then shouldn't they just be taken off the table and have the board relied on that? At least as to that element, isn't that what happened to them or their willingness to work in Moldova? Doesn't seem to me like substantial evidence. So what am I missing on that? Respectfully, those individuals should not be taken off the table. The similarly situated analysis is a question When you're using those individuals, who are we talking? Does that include the ambassador or is that someone else? That I believe Judge Gould is referring to the two individuals mentioned in the advisory opinion and they should not be taken off the table simply because their situation is not exactly like petitioners. What I'm trying to find out, what was their, what political protest did they do? Like it's very different if they just don't like the government, but if they don't publicly protest, one wouldn't expect them to be at risk. Well, the question of whether one would expect them to be at risk because of whether public protest is required for an expectation of risk is a question of fact to be determined by the agency and is thus reviewed for substantial evidence, not Look, I'm reviewing, we're all reviewing it for substantial evidence. What I'm trying to get you to shed light on is if they haven't made political protest, then why would their situation be part of substantial evidence at all? And I'm not addressing if the ambassador is different or other evidence, but why would, why would you consider those people? Because the situation of the individuals who are similarly situated need not be identically situated. The court in Lanza v. INS has found, for example, that the comparison of a petitioner of an asylum applicant's situation to that of her brother was relevant even though her brother was significantly less politically active than she was. And the comparison, therefore, need not always be between identically situated individuals. I'm sure it doesn't have to be identically situated, but there has to be some substantial congruence. And what, that's what I'm seeing as missing here as to those people. Why don't you tell me at least, and of course I'm just one judge and the others can view it however they want, but how does the ambassador differ in this? You said that he was a political opponent. That is correct. He made his political opposition known and that was published to an even greater extent than the publication of petitioner's political opposition. And so therefore, the analysis of changed country conditions of the rebutted presumption in this case would be sufficient even if it relied only on the ambassador. So even if the court were to conclude, and although the respondent does not concede, that the use of the two other individuals in the advisory opinion letter, which was specifically tailored to petitioner's type of circumstances, was in some way error, that error would be harmless because of the use of the ambassador, which relied not only on State Department, which relied on State Department, excuse me, which relied on petitioner's testimony, which also relied on the internet article that was presented, that that in combination with... The petitioner argues that the ambassador's different because he was so high up and so visible in the society that he essentially would get a pass, that is they wouldn't retaliate against him. Maybe I'm misstating that, but I think they make some type of argument like that. So what's the government response to that? The immigration judge was not compelled to accept that argument. The immigration judge, excuse me, the board simply concluded that he was not, that the board was not swayed by this assessment, that the former, that for some reason the ambassador would be less of a relevant comparison than political opponents. But indeed the board went on to consider the State Department report with respect to political opponents in any case, and that consideration also mitigates any mistake, which again respondent does not concede, in the use of the, in the looking to the advisory opinion with respect to the other individuals. On page three of the record, the second page of the board's decision, the second full paragraph, the board also considered the impact of the Department of State report's citations to discussions of the effects that political opposition has on the, on an applicant's level of risk in Moldova. And so therefore the immigration, the board of course found that there was, that it was not as if there was no level of risk here, but the risk that was involved by the time of the board's decision was not a risk of persecution, it was a risk of Counsel, what, what's your answer to the, to the theoretical point put out by the petitioner in argument that if, if the record would show there's still as, as little as a 10 percent prospect that, that he could face persecution or retaliation on return, that 10 percent would be enough so that the presumption should not be rebutted? The answer would be that the, the record simply does not compel that conclusion. Whether or not the petitioner is suggesting a conclusion that perhaps the, the immigration judge or the board could have reached, but the immigration judge and the board in this case did not reach that conclusion and that conclusion is not compelled in light of the reasons the board cited. But you, you accept the 10 percent figure in theory, as I understand what you're saying, what might your answer? That is, that if there's a 10 percent chance he would be persecuted on return, that if the record compelled the conclusion that there's a 10 percent chance of persecution, then we should, we should grant the petition. But if it's, if it's not compelled, then we shouldn't. But you accept the 10 percent figure? The 10 percent figure is, was cited as, as something that could be enough in Cardozo-Fonseca, which is the Supreme Court. Now, I'm, I'm understanding you to say this is, that the 10 percent is the correct statement of the law as you stand before the IJ and the BIA. And it's, but we have to look at it through the lens of deference and compelling as opposed to looking at it in the first instance. Is that what you're saying? That's absolutely correct. And that is actually a far more eloquent summary than I believe I was giving. So the, that is essentially the position, the position here. Pardon. The, the 10 percent standard is I mean, if we were listening to this in the first instance and hearing the evidence, we could say 10 percent any way, any way that we would look at it. And then someone would have to review us through a deferential lens. But we're not hearing the witnesses, so we have, it's, the law is correct on that, but we've got to also factor in whatever the lens is we're looking through. That is precisely correct. And Right. But if, if applying the most deferential lens, we feel that the record compels the conclusion that there's at least a 10 percent chance of persecution on return. But we feel that there's a, the record compels that conclusion. Don't we have to grant the petition? Only as to asylum and only to the extent that the court would, in, in that event, remand under Ventura for, because in this case, the board's decision was issued in 2007 and conditions have, in fact, changed once again. This is not something I would, I would sort of put out there, but it's, it's possible that the board would, or DHS would elect to introduce evidence of further, more current country conditions if the court reached that conclusion with respect to this record. I'm glad that you raised that because I had a question about that, that I think I might have written a prior opinion, though I can't recall names, where we remanded, we sent a change country conditions rebutting the presumption wasn't met, but we did it on an open record, so there could be other evidence presented. And I know there's some precedents that look in the other direction that say, like, if we reject the evidence, that they don't get another shot. So what, what's the law on that? Is there a clear rule that tells us if we conclude there isn't substantial evidence on the rebuttal of the presumption as to whether the record is open on when we send it back or not? The, there's no, there's, there are cases, as Your Honor points out, that have gone different ways on that issue. And the, the Ventura, there's a statement in the Supreme Court's Ventura decision that, that is interesting. Although the Board did not create, did not reach a country conditions determination in that case, the court in Ventura listed as its second reason for electing remand that the record could be updated with additional evidence. And that, that is one reason supporting the application of the remand. Well, isn't the difference, my understanding of how they're distinguished sometimes, if it's a, if it's a static body of evidence and the government or someone else chose only to present a certain amount, they don't get a do-over of a static body. But change country conditions is not a static, you know, what it was in 2007 and what it is in 2010 are not necessarily going to be the same. So it's not static. So it's not, isn't that part of the distinction that the cases make? It is. And that, I think, was what the Supreme Court was getting at in that second portion of the rationale in Ventura. And that is because it's simply just the nature of the change country conditions determination. It will, it will virtually never be a static inquiry. I mean, because sometimes the government wants a do-over when everything was available at the time of the hearing. And the position is, well, yeah, why didn't you do it then? You don't get, you know, it's not like you get, when you find out it didn't work the But when it's a different body of evidence, that's a different situation. And, of course, the evidence, of course, we do not concede that this case should be remanded. But even if it, even if the Court were to hold that that were the proper course of action, that that was the proper course of action, the intervening three and a half years, even just almost four years, between the decision date and today's date, in light of the inherently sort of fluctuating nature of a change country conditions determination, would, would militate against the sort of granting of a petition without a chance for the government to present more current information. The allegation would not be that the government could have in some way presented better evidence before the Board, before the immigration judge. The question would simply be whether that evidence would still be current following remand. All right. Unless there are additional questions, we've taken you over. Thank you. Your Honors, very quickly, I would argue there were two things that separated Mr. Gorchak from the two individuals in the Foreign Ministry, including the Ambassador. One was that he engaged in very active political activities. And I think that's not really true with the Ambassador. But more importantly, he had all of the attacks, the beatings, the arrests, all of those things happened to him in 2001 that clearly didn't happen to the Ambassador, who was welcomed back, given a post to the university, etc., etc. So there's the real distinction. There was no risk of harm in 2001 to the Ambassador. And this, the BIA found there was past persecution of him in 2001. So there's no basis for saying there was risk to the Ambassador in 2001 or 2005. They concluded there was risk to him. In fact, he suffered past persecution in 2001. And so their conclusion drawing, comparing him to the Ambassador and the other Foreign Ministry official is not appropriate because there was no risk to him in the beginning. So it's changed. Do you con- Counsel? Go ahead. I was just going to ask this. Let's, it's not certain how we will decide. Either, could be either way. But let's assume for a moment that the panel's persuaded that there's not substantial evidence of changed conditions to rebut the presumption from past persecution. Then how do you address the issue of scope of remand? That is, do you agree with the government's position that under Ventura, we could not tell the BIA that they have to go forward without taking other evidence? And also, in light of Judge Callahan's comments about the record or questions about the record not being static, I guess I'd like to hear your views on that. Also, I wrote an opinion in a case called Soto Alarte in a different but analogous context that talked about when we don't accept an adverse credibility decision, we should remand on an open record as opposed to saying they're deemed true. So how do you, how do you address that? Well, I certainly think that a remand would be a more appropriate and humanitarian result here than simply affirming the board's inappropriate decision not based on substantial evidence. We did argue in a reply brief that based on both Ventura and Babala, the other case we cited, that remand is not appropriate where the BIA had already considered the eligibility. And that's a very difficult analysis. Well, but let's say it's gotten worse and you go back on a remand. You would be screaming and hollering and wanting to introduce that, right? Exactly. And that's why I think it is a more appropriate humanitarian decision than simply requiring him to go back to a situation that might be much worse. Well, but I'm just saying what's good for the goose is good for the gander. If it goes back, isn't it relevant what it is there right now where he would be returned to as opposed to what it was like in 2007? It is certainly relevant as long as it's, as Your Honor suggests, an open record for both sides to submit evidence on. So I would believe and argue and leave the Court with that thought that there was not substantial evidence for this finding. And we would argue that a reversal is appropriate. If not a reversal, then at least a remand. All right. Thank you both for your argument. This matter will stand submitted. And I'm sorry we, you know, I hope we didn't delay your flight back to D.C. But all's well that ends well. Thank you. All right. Thank you.
judges: England, Gould, Callahan